UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
EVERETT SEE and SALVATORE CRISTIANO,
on behalf of themselves and all
others similarly situated.

      Plaintiffs,

               -v-                        Case No. 2:21-cv-547-PKC-AKT

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO, and GEICO
GENERAL INSURANCE COMPANY,

      Defendants

---------------------------------------------------------X

## AMENDED CLASS ACTION COMPLAINT

Everett See and Salvatore Cristiano ("Plaintiffs") bring this class action on behalf of themselves and all others similarly situated, by and through undersigned counsel, and for their Complaint against Government Employees Insurance Company d/b/a GEICO ("Government Employees") and its subsidiary GEICO General Insurance Company ("GEICO General," collectively with Government Employees referred to as "Defendants") state and allege as follows:

## INTRODUCTION

1.     In September 2020, Mr. See was involved in a three-car accident, wherein his vehicle was determined by Defendants to be a total loss. Pursuant to his insurance policy, Defendants settled Mr. See's claim by purporting to pay the actual cash value of his vehicle.

2.     Similarly, in October 2018, the Cristiano vehicle covered under Mr. Cristiano's policy was declared a total loss. Defendants also settled Mr. Cristiano's claim by purporting to pay the actual cash value of the loss vehicle.

3.     For both claims, Defendants used valuation reports provided by CCC Information Services, Inc. ("CCC") to, in theory, fairly and accurately assess the value of Plaintiffs' loss

vehicles. However, these valuation reports systematically misrepresent and undervalue the actual cash value of claimants' loss vehicles.

4.      When valuing loss vehicles, CCC's reports scrutinize and itemize the condition of claimants' loss vehicles across nine components (mechanical, tires, paint, etc.), comparing them to "Average Private condition" and making monetary adjustments accordingly. CCC then deceptively represents it "sets" each "comparable vehicle to Average Private condition." In truth, the reports set each comparable vehicle to a condition *better* than so-called Average Private condition with no explanation or documentation that the comparable vehicles were even inspected. This baseless and hidden assumption results in a concealed monetary adjustment that reduces the valuation of the claimant's loss vehicle, even where that vehicle is in average or better-than-average condition. Defendants, in turn, systemically use these reports as the basis for offering claimants what they, deceptively, purport to be the actual cash value of the covered totaled vehicles.

5.      Here, in determining the value of Mr. See's loss vehicle, Defendants, using a CCC report, performed the nine-component inspection and determined that five components of his loss vehicle were in "Average Private" condition and that the remaining components were in "Dealer Retail" condition. Based on this, the CCC report misleadingly represented that Mr. See received a $216 positive condition adjustment.

6.      In determining the value of the comparable vehicles, the valuation report represented that the three comparable vehicles also were "set" to the category of "Average Private condition." But, without explanation, or even documentation that the three comparable vehicles had even been inspected, each was actually presumed or "set" to be in a condition deemed $706 better than Average Private condition. Had those vehicles truly been set to "Average Private

2

condition," no dollar adjustment would be necessary. Therefore, based on these deceptive and unsupported condition adjustments, Defendants paid Mr. See $706 less than the actual cash value of his total loss vehicle.

7.      Similarly, in valuing Mr. Cristiano's vehicle, Defendants, using a CCC valuation report, performed the same nine-component inspection, and found that five components were in Average Private condition, while the remainder were in Dealer Retail condition, resulting in a $505 positive condition adjustment. However, just as with Mr. See, each comparable vehicle used to value Mr. Cristiano's loss vehicle was deceptively presumed to be in a condition deemed $986 better than Average Private condition. As a result of these deceptive and unsupported condition adjustments, Defendants paid Mr. Cristiano $986 less than the actual cash value of his total loss vehicle.

8.      As detailed below, Defendants' negative condition adjustments are: (a) deceptive and hidden; (b) not supported by inspection, factual information or documentation; (c) contrary to appraisal standards and methodologies; (d) not applied by the major competitors of Defendants' vendor CCC, and (e) not applied by Defendants to insureds in other states like California.

9.      Plaintiffs, on behalf of themselves and all others similarly situated in the classes and subclasses defined below, seek actual damages, statutory damages, an injunction, attorneys' fees, and other appropriate remedies caused by Defendants' breaches of contract and violations of New York General Business Law § 349 ("GBL").

## <u>JURISDICTION AND VENUE</u>

10.     Mr. See is a resident of the State of New York.

11.     Mr. Cristiano is a resident of the State of New York.

12.     Government Employees and GEICO General are related insurance companies authorized to do business in the State of New York, and, at all relevant times hereto, were engaged in the marketing, sale, and issuance of automobile policies and the adjustment of claims under those policies throughout the State of New York. Government Employees and GEICO General committed the breaches of contract and deceptive business acts and practices in connection with that business as alleged herein.

13.     The compensatory damages being sought by each of the Plaintiffs do not exceed $75,000 and no individual member of the Classes would possess a compensatory damage claim in excess of $75,000. In their Notice of Removal, Defendants stated that the aggregate compensatory damages (in the amount of the negative condition adjustments that were deceptively deducted), claimed by Plaintiff and the Classes greatly exceeds the $5,000,000 federal jurisdictional threshold under the Class Action Fairness Act ("CAFA"). ECF No. 1 at ¶¶ 31-35.

14.     Venue is proper in this Court because a substantial part of the events and conduct giving rise to the violations of law occurred in this district (Nassau County). Defendants are foreign corporations authorized to transact business in the State of New York. Defendants share a principal office in the State in Nassau County at 750 Woodbury Rd. Woodbury, New York 11797.

## PLAINTIFFS

15.     Plaintiff Everett "Sam" See resides in Lewis County, New York. At all relevant times, Plaintiff See was contracted with Defendants for automobile insurance. On or about September 18, 2020, Plaintiff See was in a car wreck, and Defendants deemed his vehicle to be a total loss.

16.     Plaintiff Salvatore Cristiano resides in Suffolk County, New York. At all relevant times, Plaintiff Cristiano was contracted with Defendants for automobile insurance. On or about

4

October 6, 2018, Plaintiff Cristiano was in a car wreck, and Defendants deemed the covered vehicle to be a total loss.

## **DEFENDANTS**

17.     Defendant Government Employees (Government Employees Insurance Company d/b/a GEICO) has its corporate headquarters located at 5260 Western Avenue, Chevy Chase, MD 20815. According to its website, https://www.geico.com/about/corporate/corporate-ownership/, Government Employees conducts business in New York and throughout most of the United States under the brand GEICO and through its subsidiaries (the "GEICO Companies"), insurance agents and other company personnel. The GEICO Companies include GEICO General, GEICO Casualty Company, and GEICO Indemnity Company. Government Employees, GEICO General, and the other GEICO Companies market collectively under the trademark GEICO. Government Employees and its subsidiary GEICO Companies market and issue automobile insurance policies in New York.

18.     Upon information and belief, Government Employees performs substantially all insurance operations of the GEICO Companies, including GEICO General, GEICO Casualty Company, and GEICO Indemnity Company. Only one GEICO entity—"GEICO Insurance Agency"—is registered to business with the New York Department of State. *See* Exhibit 1. According to the New York Department of Financial Services, all four GEICO entities— Government Employees, GEICO General, GEICO Casualty and GEICO Indemnity—have the same telephone number and operate from the same address. *See* Exhibit 2.

19.     Most relevant to this action, Government Employees, on behalf of itself and the three subsidiary GEICO Companies, adjusts total loss automobile claims made on policies of insurance issued by Government Employees and any of the three subsidiary GECIO Companies

in New York, pursuant to the same policies and practices, by the same adjustor employees working in the same central Claims Center, utilizing a single website (www.geico.com), and using the same address, telephone number, and letterhead on correspondence. GEICO recruits claims representatives in New York through its website (www.careers.geico.com). Those job postings state "GEICO is looking for Claims Service Representatives" and refer throughout to "GEICO" as the entity advertising for employment. *See* Exhibit 3. Further, each of the Plaintiffs' valuation reports makes reference only to "GEICO" with none of the other GEICO Companies being listed. Indeed, "GEICO" is referenced over a dozen times in each valuation report, while none of the GEICO Companies are listed.

20.     As detailed at the GEICO Companies' website,[1] Government Employees d/b/a GEICO investigates, handles, and adjusts all insurance claims using the same policies and procedures, regardless which GEICO Company or Companies issued the relevant policy. *See* Exhibit 4. These common policies and procedures, implemented by the same adjustor employees, apply specifically to the "Total Loss Process" for adjusting claims for actual cash value when a total loss is covered by the policy. *Id.*

21.     Upon further information and belief, Government Employees is the custodian of record for GEICO Companies, including GEICO General; Government Employees employed and paid the adjusters who adjusted Plaintiffs' and the putative Classes' total loss claims; and Government Employees was directly involved in the wrongdoing alleged herein as the adjustor of the total loss claims.

22.     Defendant GEICO General (GEICO General Insurance Company) is a subsidiary of Government Employees and markets collectively under the trademark "GEICO." GEICO

---

[1] https://www.geico.com/claims/claimsprocess/

General provides policies of automobile insurance in the State of New York. GEICO General's corporate headquarters is located at the same office as Government Employees at 5260 Western Avenue, Chevy Chase, MD 20815. GEICO General markets and sells insurance policies throughout the State of New York under the trademark GEICO and pays property-damage claims to residents of the State of New York, including Plaintiffs.

## DEFENDANTS' INSURANCE POLICIES

23.     Consistent with marketing, selling, and adjusting insurance under the same GEICO trademark, out of the same corporate headquarters and regional offices, and via the same website (www.geico.com), Defendants and the GEICO Companies issue insurance policies with no material differences relevant to the claims in this action.

24.     Mr. See's insurance policy is attached as Exhibit 5.

25.     All four GEICO Companies are listed at the beginning of the insurance policy. *Id.* at p. 1. Further, all four GEICO Companies are listed again at the end of the insurance policy, each with the same address:  5260 Western Avenue, Chevy Chase, Maryland 20815-3799.

26.     The policy is signed by "O.M. Nicely, President" and "W.C.E. Robinson, Secretary." O.M. Nicely is, or was at the relevant time, President of Government Employees. W.C.E. Robinson is, or was at the relevant time, corporate secretary of Government Employees. *See* Exhibit 4.

## FACTUAL ALLEGATIONS

27.     On September 18, 2020, Mr. See was involved in a car wreck and sustained physical damage to his vehicle.

28.     On October 6, 2018, Mr. Cristiano was involved in a car wreck and sustained physical damage to the covered vehicle.

7

29.    Like all members of the putative Classes, each Plaintiff made a property-damage claim to Defendants.

30.    Defendants declared both Plaintiffs' vehicles to be a total loss and purported to offer each of them the actual cash value of their loss vehicle, as was required under the uniform provisions of its insurance policies.

31.    On September 22, 2020, Defendants provided Mr. See a document entitled "Total Loss Settlement Explanation." *See* Exhibit 6. This document explained how Defendants arrived at the actual cash value of Mr. See's total loss vehicle.

32.    In the explanation, Defendants represented that the base value of Mr. See's totaled vehicle was *increased* by $216 based on the condition of his loss vehicle. This representation was deceptive. In reality, the value of Mr. See's total loss vehicle was *decreased* based on a condition adjustment.



**Figure 1: Defendants' "Total Loss Settlement Explanation" for Mr. See's claim.**

33.    Defendants determined the actual cash value of both Plaintiffs' total loss claims by employing a routine total loss settlement process that involved obtaining a valuation report from CCC and then using that valuation to calculate the benefit payment under the policy.

34.    CCC's valuation reports during the relevant period followed the same process, provided and disclosed the same or substantially the same information, and presented that information in the same or substantially same format. These valuation reports purport to contain values for comparable vehicles recently sold or for sale in the claimant's geographic area. The reports contain a purported valuation for the loss vehicle based upon advertisements for comparable vehicles listed in the report. CCC then adjusts the advertised prices of those comparable vehicles "to reflect differences in vehicle attributes, including mileage and options." *See* Exhibit 7 at 2[2] (under heading "Calculate Base Vehicle Value"); Exhibit 8 at 2 (also under heading "Calculate Base vehicle Value").

35.    The "Base Vehicle Value," which equates with the loss vehicle's actual cash value before taking into account the condition of the loss vehicle, "is the weighted average of the adjusted values of the comparable vehicles[.]" *Id.*

36.    At issue here is the improper way CCC systemically applies negative condition adjustments, which Defendants use to undervalue claimants' total loss claims. Plaintiffs' experiences are representative of this systemic undervaluation of total loss claims made by Defendants.

37.    Although not disclosed in either valuation report, CCC makes a further adjustment in arriving at the Base Vehicle Value based on an unfounded, undocumented, and unexplained

---

[2] Pinpoint citations to Plaintiffs' respective CCC reports refer to the page numbers at the bottom right-hand corner of the reports.

assumption that the condition of each comparable vehicle is in a condition better than "Average Private condition."

38.     Mr. See made a claim for property damage to Defendants, which deemed the vehicle a total loss. Based on the valuation report provided by CCC, Defendants determined the actual cash value of Mr. See's loss vehicle was $9,513 and paid the claim accordingly.[3]

39.     Similarly, Defendants determined the value of Mr. Cristiano's totaled vehicle using a valuation report prepared by CCC. Based on that valuation report, Defendants determined the actual cash value of Mr. Cristiano's loss vehicle was $11,885 and paid the claim accordingly.[4]

40.     In the "Vehicle Condition" section of each Plaintiff's report, CCC explains, in the box on the righthand side of the page, that it "makes dollar adjustments that reflect the impact the reported condition" of the loss vehicle "has on the value of the loss vehicle as compared to Average Private condition." Exhibit 7 at 6; Exhibit 8 at 6. Nowhere in the report does CCC explain the criteria for determining "Average Private condition."

41.     In assessing the condition of Mr. See's loss vehicle, CCC examined nine components of the vehicle, documented that examination, and found five components to be in "Average Private" condition and four to be in "Dealer Retail" condition. Exhibit 7 at 6-8.

---

[3] This amount is before the addition of taxes and fees and subtraction for Mr. See's deductible.
[4] This amount is before the addition of taxes and fees.

 VEHICLE CONDITION

### COMPONENT CONDITION

| | Condition | Inspection Notes/Guidelines | Value Impact |
|---|---|---|---|
| Mechanical | AVERAGE PRIVATE | **Notes:** BELTS AND HOSES SOW LIGHT WEAR AND SEEPAGE<br>**Guideline:**<br>**Transmission:** Fluid slightly discolored. A few areas of seepage.<br>**Engine:** Minor seepage. Belts and hoses firm, show minimal wear. Minimal dirt and grease in engine compartment. | $ 0 |
| Tires | AVERAGE PRIVATE | **Notes:** LF5RF5LR5RR5<br>**Guideline:**<br>**Rear Tires:** 41% to 68% of new. Example: Typical new car tires are 11/32, loss measures at 5/32 = 46% (5/11)<br>**Front Tires:** 41% to 68% of new. Example: Typical new car tires are 11/32, loss measures at 5/32 = 46% (5/11) | $ 0 |
| Paint | AVERAGE PRIVATE | **Notes:** FEW SX<br>**Guideline:**<br>Few small deep chips and/or scratches. No significant peeling and/or flaking. Minor swirl marks. Slight Fading. | $ 0 |
| Body | AVERAGE PRIVATE | **Notes:** FEW DINGS NO RUST<br>**Guideline:**<br>**Sheet Metal:** Few dents and/or numerous dings. No significant surface rust.<br>**Trim:** Minimal damage to components. Few dents and/or numerous dings. | $ 0 |
| Glass | AVERAGE PRIVATE | **Notes:** FEW PITS NO CHIPS SEALS INTACT<br>**Guideline:**<br>Light surface scratches and/or pitting. Few chips. | $ 0 |
| Seats | DEALER RETAIL | **Notes:** CLEAN<br>**Guideline:**<br>Clean. No significant tears, holes and/ or burn marks. No significant wear. No bare spots. Lightly worn primarily in driver's area. | $ 58 |



**Figure 2: Vehicle Condition Section of Mr. See's Valuation Report.**

42.     Based on this detailed inspection of Mr. See's loss vehicle, CCC purported to apply a positive condition adjustment of $216.

43.     Similarly, CCC determined that five components of Mr. Cristiano's loss vehicle were in "Average Private" condition and four were in "Dealer Retail" condition. Based on this determination, CCC purported to apply a positive condition adjustment of $505. These representations are deceptive and conceal the condition adjustments made to the comparable vehicles that were made to decrease the value of both Plaintiffs' loss vehicles based on their condition relative to the comparable vehicles.

44.     On the first page of the report, CCC represents that only the condition adjustment from the component inspection is applied to the Base Vehicle Value. Exhibit 7 at 1; Exhibit 8 at 1. That representation is deceptive and falsely states that the base value of the Plaintiffs' total loss vehicles were *increased* based on condition adjustments.



**Figure 3: Defendants' "Valuation Summary" for Mr. See's claim.**

**VALUATION SUMMARY**

| | |
|---|---|
| **Base Vehicle Value** | **$ 12,380.00** |
| Condition Adjustment | + $ 505.00 |
| **Adjusted Vehicle Value** | **$ 12,885.00** |
| **Value before Deductible** | **$ 12,885.00** |
| Deductible | - $ 1,000.00 |
| **Total** | **$ 11,885.00** |

**Figure 4: Defendants' "Valuation Summary" for Mr. Cristiano's claim.**

45.     Following the "Vehicle Condition" section of the report, in a section entitled "Comparable Vehicles," CCC provides information about multiple vehicles deemed similar to the loss vehicle that are purportedly "reflective of the market value" of the loss vehicle. Ex. 7 at 8; Ex. 8 at 8.

46.     Using Internet or dealer advertisements of each comparable vehicle as a starting point, CCC adjusted the price of each comparable vehicle to account for differences between the loss vehicle's and each comparable vehicle's options and mileage. *See id.*

47.     However, for condition, in the margin, CCC tells the reader that "[t]he **Condition Adjustment** sets that comparable vehicle to Average Private condition, which the loss vehicle is also compared to in the Vehicle Condition section." *Id.* at 8–9 (bolding original).



**Figure 5: Condition Adjustment Definition from Comparable Vehicle Section.**

48.     This statement is deceptive. For each component of Plaintiffs' vehicles that was found to be in Average Private condition, no adjustment was made. Exhibit 7 at 6-7; Exhibit 8 at 6-7. Thus, if the condition of each comparable vehicle was also set to "Average Private condition" there should be no adjustment made to the prices of the comparable vehicles based on condition.

49.     In truth, for Mr. See, CCC deducted $706 from the advertised price of each comparable vehicle as an adjustment for "Condition." Exhibit 7 at 9. Therefore, after accounting for the condition adjustments that were actually made, the value of Mr. See's loss vehicle was *reduced* by $706. This negative condition adjustment is not disclosed on the Report Summary of the CCC valuation report (instead the report misleadingly represents only a $216 increase) nor is this negative condition adjustment disclosed in the Total Loss Settlement Explanation.

50.     Defendants, in turn, misrepresented to Mr. See that the actual cash value of his car was $706 less than it should have been based on these deceptive, unsubstantiated, and unfounded condition adjustments.

51.     Similarly, for Mr. Cristiano, CCC deducted $986 from the advertised price of each comparable vehicle as an adjustment for "Condition." Exhibit 8 at 9. Therefore, after accounting for the condition adjustments that were actually made, the value of Mr. Cristiano's loss vehicle was *reduced* by $986. This negative condition adjustment is not disclosed in the Report Summary of the valuation report or in the Total Loss Settlement Explanation.

52.     Defendants, in turn, misrepresented to Mr. Cristiano that the actual cash value of the covered vehicle was $986 less than it should have been based on these deceptive, unsubstantiated, and unfounded condition adjustments.

53.     Neither Defendants nor CCC provides any explanation for these deductions. The report contains no description or itemization of the condition of the comparable vehicles (much less of the nine components utilized when evaluating the condition of the loss vehicle). The report provides no indication that the condition of each comparable vehicle was examined. Based on the meager information in the valuation report, it appears that, contrary to the representation that CCC "sets [each] comparable vehicle to Average Private condition," each comparable vehicle was, in truth, simply assumed to be in better condition than "Average Private condition" without any basis to measure, discern, or specify the conditions of the comparable vehicles or how they were, uniformly, found to be in a condition that rendered them more valuable than "Average Private condition."

54.     Defendants' negative condition adjustments are deceptive and hidden.  As detailed above, Defendants do not disclose these negative condition adjustments in the Total Loss

Settlement Explanation or in the Valuation Summary section of the Valuation Report. Moreover, later in the report, Defendants deceptively inform the reader that the condition of each comparable vehicle was "set" to "Average Private Condition" when, in truth, the condition was set to an undescribed and undisclosed condition deemed more valuable, resulting in a significant negative condition adjustment ($706 for Mr. See and $986 for Mr. Cristiano).

55.    Defendants' negative condition adjustments are improperly applied with no inspection of the comparable vehicles, no factual support regarding their condition, and no documentation of their condition.

56.    Defendants' negative condition adjustments are contrary to appraisal standards. There are multiple generally-recognized and acceptable methodologies for determining actual cash value, including use of comparable vehicles. Defendants begin the process of valuing loss vehicles using comparative methodology but improperly deviate from that process by thumbing the scales in favor of themselves. Defendants document the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and make dollar adjustments accordingly. Plaintiffs do not challenge these documented adjustments. Defendants also inspect the loss vehicle's condition and document the condition of the components inspected. At this stage of the process, Defendants abandon the comparative methodology and assume each uninspected comparable vehicle is in an undefined or described condition better than average condition. Without inspection, factual support, and documentation, there is no basis for assuming the comparable vehicles are in anything other than average condition, and appraisers do not recognize as legitimate a deduction based on such assumptions.

57.    The impropriety and arbitrariness of Defendants' negative condition adjustments are further demonstrated by the fact that CCC's primary competitors in providing valuation reports

to insurance companies—Mitchell International, Inc. and Audatex North America, Inc.—do not apply negative condition adjustments in this manner. Instead, these companies set each comparable vehicle to average condition.

58.     The impropriety and arbitrariness of Defendants' negative condition adjustments are further demonstrated by the fact that Defendants do not apply these negative condition adjustments when valuing total losses for their insureds in California. Instead, like their competitors, Defendants set the condition of the comparable vehicles to average. There is no justification for applying these negative condition adjustments when valuing total losses in New York while not subjecting California insureds to the same negative condition adjustments.

59.     Plaintiffs and each member of the class were damaged by Defendants' application of these negative condition adjustments because they were not paid the actual cash value they would have received had Defendants applied proper methodologies and appraisal standards.

60.     Were it not for this deceptive and improper adjustment, the "Adjusted Comparable Value" of each comparable vehicle would have been higher, resulting in a higher base value for each totaled loss vehicle and in turn a higher payment for actual cash value. Specifically, for Mr. See, were it not for this deceptive and improper adjustment, the "Adjusted Comparable Value" of each comparable vehicle would have been $706 higher, resulting in a base value $706 higher and, in turn, a payment for actual cash value $706 higher, before adding applicable taxes. For Mr. Cristiano, were it not for this deceptive and improper adjustment, the "Adjusted Comparable Value" of each comparable vehicle would have been $986 higher, resulting in a base value $986 higher and, in turn, a payment for actual cash value $986 higher, before adding applicable taxes.

## CLASS ALLEGATIONS

61.    This action is brought by Plaintiffs as a class action, on their own behalf and on behalf of all others similarly situated, under Rule 23 of the Federal Rules of Civil Procedure, for damages, plus interest, costs, and attorney's fees. Plaintiffs seek certification of this action as a class action on behalf of the following Classes:

**Breach of Contract Class (Against Government Employees)**: All persons who made a first-party claim on a policy of insurance issued by Government Employees and any of the subsidiary GECIO Companies (GEICO General, GEICO Casualty Company, and GEICO Indemnity Company) to a New York resident who, from the earliest allowable time through the date of resolution of this action, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by CCC and the actual cash value was decreased based upon condition adjustments to the comparable vehicles used to determine actual cash value.

**Breach of Contract Subclass (Against Government Employees and GEICO General)**: All persons who made a first-party claim on a policy of insurance issued by Government Employees and GEICO General to a New York resident who, from the earliest allowable time through the date of resolution of this action, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by CCC and the actual cash value was decreased based upon condition adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law §349 Class (Against Government Employees)**: All persons who made a claim on a policy of insurance issued by Government Employees and any of the subsidiary GECIO Companies (GEICO General, GEICO Casualty Company, and GEICO Indemnity Company)  to a New York resident who, from the earliest allowable time through the date of resolution of this action, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by CCC and the actual cash value was decreased based upon condition adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law §349 Subclass (Against Government Employees and GEICO General)**: All persons who made a claim on a policy of insurance issued by Government Employees and GEICO General to a New York resident who, from the earliest allowable time through the date of resolution of this action, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by CCC and the actual cash value was

18

decreased based upon condition adjustments to the comparable vehicles used to determine actual cash value.

62.  Plaintiffs reserve the right to amend or modify the definitions of the Classes.

63.  Excluded from the Classes are Defendant Government Employees; Defendant GEICO General; any parent, subsidiary, affiliate, or controlled person of either defendant, as well as the officers and directors of either defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this action.

64.  **Numerosity (Rule 23(a)(1)).** The exact number of the members of each Class, as herein identified and described, is not known, but Defendants have represented that for 2020 alone, Government Employees and GEICO General handled more than 23,000 total loss claims for New York insureds. ECF No. 1 at ¶ 26. Accordingly, each Class is so numerous that joinder of individual members herein is impracticable.

65.  **Commonality (Rule 23(a)(2)).** There are common questions of law and fact in the action that relate to and affect the rights of each member of the Classes and the relief sought is common to the entire class. In particular, the common questions of fact and law include:

a.  Whether Defendants systemically used CCC reports in adjusting total loss claims;

b.  Whether the CCC reports included unfounded and deceptive negative condition adjustments applied to the value of the comparable vehicles that reduced the base value, and thus the actual cash value, of Plaintiffs' and Class members' total loss vehicles;

c.  Whether, through use of CCC's valuation reports, Defendants paid claimants less than the actual cash value, in breach of the standard provisions of its policies of insurance;

19

    d.   Whether representing to claimants that the CCC valuation equated with the total loss vehicle's actual cash value was deceptive;

    e.   Whether Defendants' breaches of contract and deceptive acts and practices injured Plaintiffs and members of the Classes;

    f.   Whether Plaintiffs and the Class members are entitled to compensatory damages, statutory damages, and/or treble damages, and if so, the calculation of damages; and

    g.   Whether Plaintiffs and members of the Classes are entitled to an injunction restraining Defendants' future deceptive acts and practices.

66.    **Typicality (Rule 23(a)(3)).** The claims of the Plaintiffs, who are representative of each of the Classes herein, are typical of the claims of the proposed Classes, in that the claims of all members of the proposed Classes, including the Plaintiffs, depend on a showing of the acts of Defendants giving rise to the right of Plaintiffs to the relief sought herein. There is no conflict between the named Plaintiffs and the other members of the proposed Classes with respect to this action, or with respect to the claims for relief set forth herein. Like all members of each class, both Plaintiffs' vehicles were declared total losses, and their values were assessed using a CCC valuation report. Each report found all components of Plaintiffs' vehicles to be in either "Average Private" or "Dealer Retail" condition. Nevertheless, each of the comparable vehicles used to calculate actual cash value of the loss vehicle received uniform negative condition adjustments, despite purporting to be "set" to "Average Private condition." Plaintiffs' claims are typical for each class member, regardless of the GEICO entity. The insurance policies at issue specifically name each of the GEICO entities at issue. Furthermore, the CCC valuation reports state only that

they are prepared for "GEICO," without naming a specific GEICO subsidiary. Accordingly, there are no issues unique to a GEICO subsidiary that would render either Plaintiff's claims atypical.

67.    **Adequacy (Rule 23(a)(4)).**  The named Plaintiffs are the representative parties for the Classes, and are able to, and will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned with, and do not conflict with, the interests of the Classes. The attorneys for the Plaintiffs and the Classes are experienced and capable in complex civil litigation, insurance litigation, and class actions.

68.    **Predominance & Superiority (Rule 23(b)(3)).**  Class certification is appropriate under Rule 23 because the common questions of law and fact in this case predominate over questions affecting only individual members of the Classes, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. The class action procedure would permit a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence and effort. Class treatment also would permit the adjudication of claims by class members whose claims are too small and complex to individually litigate against large corporate defendants.

69.    **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).**  Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

70.    **Particular Issues (Rule 23(c)(4)).**  Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4).  Their claims consist of particular issues that are

common to all members of the Classes and are capable of class-wide resolution that will significantly advance the litigation.

**<u>FIRST CAUSE OF ACTION</u>**
**BREACH OF CONTRACT**
(ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE BREACH OF CONTRACT CLASS AND SUBCLASS)

71.     Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

72.     This cause of action is asserted on behalf of Plaintiffs and members of the Breach of Contract Class against Defendant Government Employees. This cause of action is asserted on behalf of Plaintiff and members of the Breach of Contract Subclass against Defendants Government Employees and GEICO General.

73.     Both Plaintiffs (similar to all members of the Breach of Contract Class and the Breach of Contract Subclass) made claims for property damage to Defendants.

74.     At the time of these claims, each Plaintiff and Defendants were parties to an insurance contract that required Defendants to pay insureds (including Plaintiffs) the actual cash value of their total loss claim.

75.     Before making their claims and in the time since, each Plaintiff has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in that policy.

76.     Through the use of improper and unfounded condition adjustments hidden in CCC valuation reports, as detailed above, Defendants settled each Plaintiffs' claim, and the claims of the members of the proposed Breach of Contract Class and Subclass, for less than the actual cash value required by the insurance contract.

77.     As a direct result of Defendants' breaches, Plaintiffs and members of the Breach of Contract Class and Subclass sustained actual damages. Mr. See's damages are at least $706, plus

22

applicable tax calculation adjustments and pre-judgment interest. Mr. Cristiano's damages are at least $986, plus applicable tax calculation adjustments and pre-judgment interest.

## SECOND CAUSE OF ACTION
## VIOLATION OF N.Y. GEN. BUS. LAW § 349
**(**ON BEHALF OF PLAINTIFF AND MEMBERS OF THE GEN. BUS. LAW § 349 CLASS AND SUBCLASS)

78.     Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

79.     This cause of action is asserted on behalf of Plaintiffs and members of the Gen. Bus. Law §349 Class against Defendant Government Employees. This cause of action is asserted on behalf of Plaintiffs and members of the Gen. Bus. Law §349 Subclass against Defendants Government Employees and GEICO General.

80.     Both Plaintiffs (similar to all members of the Gen. Bus. Law §349 Class and the Gen. Bus. Law §349 Subclass) made claims for property damage to Defendants.

81.     New York General Business Law § 349(a) provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

82.     The acts and practices alleged herein are deceptive and were carried out in the conduct of Defendants' business. Specifically, the use of hidden, misrepresented, undocumented, and unfounded condition adjustments contrary to appraisal methodologies and standards (as detailed above) as a means of undervaluing claimants' total loss claims has the capacity to and does deceive and injure consumers.

83.     Defendants used these unsupported misrepresentations about the relative conditions of totaled vehicles and comparable vehicles to systematically undervalue and, in turn, underpay Plaintiffs' total loss claims as well as the total loss claims of members of the proposed Gen. Bus. Law § 349 Class and Subclass.

84.     Defendants used valuation reports that systematically misrepresent and undervalue the actual cash value of claimants' loss vehicles. The reports scrutinize and itemize the condition of the claimant's loss vehicle, comparing it to "Average Private condition." For the vehicles chosen for comparison, however, the reports deceptively represent that the evaluation "sets [each] comparable vehicle to Average Private condition." Contrary to this representation, the reports set each comparable vehicle to a condition *better* than Average Private condition with no explanation or documentation that the comparable vehicles were inspected. Based on this undocumented assumption, the reports apply a hidden monetary adjustment that reduces the valuation of the claimants' loss vehicle. Defendants, in turn, systemically use these reports as the basis for offering claimants what they, deceptively, purport to be the actual cash value of their totaled vehicles.

85.     Here, Defendants misrepresented the relative conditions of Mr. See's totaled vehicle and the comparable vehicles to undervalue Mr. See's claim and pay him $706 less than the actual cash value to which he was entitled. Similarly, Defendants misrepresented the relative conditions of Mr. Cristiano's totaled vehicle and the comparable vehicles to undervalue Mr. Cristiano's claim and pay him $986 less than the actual cash value to which he was entitled.

86.     Moreover, GEICO deceived Plaintiffs and members of the Gen. Bus. Law § 349 Class and Subclass by representing that its payments, which were reduced by these unsupported condition adjustments, represented the actual cash value of their totaled vehicles.

87.     As a result of Defendants' actions, Plaintiffs and members of the Gen. Bus. Law § 349 Class and Subclass incurred damages, including actual damages in the amount of the improper and deceptive negative condition adjustment, applicable tax calculation adjustments, statutory damages under N.Y. Gen. Bus. Law § 349(h) where applicable, treble damages up to $1,000 under N.Y. Gen. Bus. Law § 349(h) where applicable, and pre-judgment interest.

24

88.     Plaintiffs and members of the N.Y. Gen. Bus. Law § 349 Class and Subclass are entitled to reasonable attorney's fees upon prevailing pursuant to Gen. Bus. Law § 349(h).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a)      determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certify the proposed Classes for class treatment, appoint Plaintiffs as class representatives for each Class, and appoint undersigned counsel as Class Counsel;

b)      enter an order finding that Defendants' actions described herein constitute breaches of the express terms of its policies of insurance;

c)      enter an order finding that Defendants' actions described herein constitute violations of N.Y. Gen. Bus. Law § 349;

d)      award Plaintiffs and members of the Classes actual damages according to proof;

e)      award Plaintiffs and members of the Gen. Bus. Law §349 Class and Gen. Bus. Law §349 Subclass, alternatively, statutory damages and treble damages up to $1,000 pursuant to N.Y. Gen. Bus. Law § 349(h);

f)      enter an injunction restraining Defendants' use of deceptive and unfounded condition adjustments in determining the actual cash value of total loss vehicles;

g)      award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

h)          award reasonable attorney's fees and costs pursuant to applicable law, including N.Y. Gen. Bus. Law § 349(h);

i)          award litigation costs and expenses pursuant to applicable law, including N.Y. Gen. Bus. Law § 349(h); and

j)          grant such other legal and equitable relief as the Court may deem appropriate, including specific performance as an alternative to damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Dated: March 8, 2021

Respectfully submitted,

_/s/ Hank Bates_____
Hank Bates (admitted *pro hac vice*)
hbates@cbplaw.com
Lee Lowther (*pro hac vice* pending)
llowther@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Phone: 501-312-8500
Fax: 501-312-8505


And

Thomas M. Mullaney (TM-4274)
THE LAW OFFICE OF THOMAS M. MULLANEY
530 Fifth Ave—23 Floor
New York, NY 10036
Phone: 212-223-0800
Fax: 212-661-9860
tmm@mullaw.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 8, 2021, I electronically transmitted the foregoing document with the Clerk of the Court using the CM/ECF system, which will provide electronic mail notice to all counsel of record.

*/s/ Hank Bates*_____
Hank Bates
