UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
EVERETT SEE and SALVATORE CRISTIANO,
on behalf of themselves and all others similarly
situated,

                    Plaintiffs,

              -against-

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO, and GEICO
INSURANCE COMPANY,

                    Defendants.
------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**
21-CV-00547 (PKC) (JMW)

**A P P E A R A N C E S :**

*Attorneys for Plaintiffs:*

Hank Bates, Esq.
Tiffany Wyatt Oldham, Esq.
Lee Lowther, Esq.
Jake Windley, Esq.
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201

    -and-

Thomas M. Mullaney, Esq.
THE LAW OFFICE OF THOMAS M. MULLANEY
530 Fifth Ave—23 Floor
New York, NY 10036


       -    -    -


*Attorneys for Defendants:*

Dan Goldfine, Esq.
Jamie L. Halavais, Esq.
2415 E. Camelback Road, Suite 500
Phoenix, AZ 85016

    -and-

Daniel P. Jaffe, Esq.
60 East 42nd Street, Suite 4600
New York, NY 10165

   *-and-*

Margaret K. Heitkamp, Esq.
511 North Broadway, Suite 1100
Milwaukee, WI 53202

**WICKS,** Magistrate Judge:

     Plaintiffs Everett See and Salvatore Cristiano commenced this putative class action against

Defendants Government Employees Insurance Company ("Government Employees") and GEICO

Insurance Company ("GEICO General") alleging that Defendants breached their respective insurance

policies with Plaintiffs by failing to pay the "actual cash value" for their vehicles totaled in accidents.

Specifically, Plaintiffs allege that Defendants systematically undervalue total loss vehicles by relying on

valuation reports generated by a non-party vendor of casualty-claim appraisals, CCC Information

Systems, Inc. ("CCC"), which function to depreciate the purported value of appraised total loss vehicles.

Plaintiffs additionally allege that Defendants, in relying on the CCC reports, violate New York General

Business Law § 349 by deceptively claiming the payment of actual cash value for total loss vehicles.

     After Plaintiffs filed the amended class action complaint (DE 21), Defendants filed a motion to

dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (DE 42).  Within that motion,

Defendants also move to strike certain allegations made against Government Employees and, should the

motion to dismiss be denied, seek to compel the appraisal of Plaintiffs' total loss vehicles.  (*Id.*)  Plaintiffs

oppose Defendants' motion in its entirety.  (DE 43.)  On September 20, 2021, the Honorable Pamela K.

Chen referred the present motion to the undersigned for a Report and Recommendation.  (Electronic

Order dated Sept. 20, 2021.)  The Court then provided the parties notice that it would be converting

Defendants' motion regarding the appraisal issue to a motion for summary judgment pursuant to Federal

Rule of Civil Procedure 12(d).  (Electronic Order dated February 11, 2022.)  For the reasons that follow,

the undersigned respectfully recommends that Defendants' motion to dismiss, motion to strike, and

motion for summary judgment be denied.

# I.    BACKGROUND

## A.  Allegations of the Amended Complaint

The following allegations, drawn from the amended complaint, are presumed true for purposes of the motion to dismiss.[1]  Plaintiffs, during the relevant period, had car insurance policies with Defendants. (DE 21 ¶¶ 1–2.)  Both Plaintiffs were in car accidents and made property-damage claims to Defendants. (*Id.* ¶¶ 27–29.)  Defendants declared both Plaintiffs' vehicles to be total losses and, as required by the respective insurance policies, purportedly offered them actual cash value for their vehicles.  (*Id.* ¶ 30.)

To value Plaintiffs' vehicles, Defendants used valuation reports provided by CCC.  (*Id.* ¶ 3.) CCC's valuation reports price loss vehicles by considering the values of comparable vehicles recently sold or for sale in the claimant's geographic area.  (*Id.* ¶ 34.)  CCC claims to adjust the advertised prices of such comparable vehicles "to reflect differences in vehicle attributes, including mileage and options." (*Id.*)  CCC then arrives at a "base vehicle value" by calculating the weighted average of the adjusted values of comparable vehicles.  (*Id.* ¶ 35.)  The base vehicle value is then used as the loss vehicle's actual cash value before CCC adjusts the valuation based on the condition of the loss vehicle.  (*Id.*)  Plaintiffs allege that, during this valuation process, "CCC systemically applies negative condition adjustments, which Defendants use to undervalue claimants' total loss claims."  (*Id.* ¶ 36.)

In the "vehicle condition" section of the valuation report, CCC explains that it "makes dollar adjustments that reflect the impact the reported condition of the loss vehicle has on the value of the loss vehicle as compared to [a]verage private condition," despite failing to explain the criteria for determining average private condition.  (*Id.* ¶ 40 (internal quotation marks omitted).)  To do so, CCC inspects the condition of nine components of loss vehicles—the base vehicle value remains unchanged for components deemed in "average private condition" and increases for components deemed in "dealer retail condition."  (*See id.* ¶¶ 41–44.)

---

[1] Although the allegations of the amended complaint are all deemed true for purposes of the motion to dismiss, the same is not true for the motion for summary judgment on the appraisal issue which, of necessity, goes beyond the mere pleadings.  *See infra.*

CCC adjusts the prices of comparable vehicles to account for differences between the loss vehicle and the comparable vehicles' options and mileage.  (*Id.* ¶ 46.)  However, CCC, for "condition adjustment[s]," sets the comparable vehicles to the average private condition figure discussed above, despite the valuation report containing "no description or itemization of the condition of the comparable vehicles" or any "indication that the condition of each comparable vehicle was examined."  (*Id.* ¶¶ 47, 53.)  CCC deducted $706 and $986 from the advertised price of each comparable vehicle as condition adjustments for Plaintiffs See and Cristiano, respectively.  (*Id.* ¶¶ 50, 52.)  Plaintiffs thus allege that, contrary to the representation that it sets comparable vehicle to average private condition, CCC "simply assume[s] [comparable vehicles] to be in better condition than [a]verage [p]rivate condition without any basis to measure, discern, or specify the conditions of the comparable vehicles or how they were, uniformly, found to be in a condition that rendered them more valuable than [a]verage private condition." (*Id.* ¶ 53 (internal quotation marks omitted).)

Accordingly, Plaintiffs allege that Defendants breached their respective insurance policies by relying on the CCC valuation reports and failing to pay Plaintiffs the actual cash value for their vehicles. (*Id.* ¶ 36.) Plaintiffs further allege that these adjustments are deceptive in violation of New York law because "Defendants do not disclose these negative condition adjustments in the [t]otal [l]oss [s]ettlement [e]xplaination or in the [v]aluation [summary section]" of the valuation report.  (*Id.* ¶ 54.)

**B. Undisputed Facts Regarding Defendants' Demand for Appraisal**

The following undisputed facts pertain only to Defendants' motion for summary judgment on the appraisal issue.  It is undisputed that the insurance policies at issue contain an identical appraisal clause, which provides:

> If we and the ***insured*** do not agree on the amount of ***loss***, either may, within 60 days after proof of ***loss*** is filed, demand an appraisal of the ***loss***. In that event, we and the ***insured*** will each select a competent appraiser. The appraisers will select a competent and disinterested umpire. The appraisers will state separately the ***actual cash value*** and the amount of the ***loss***. If they fail to agree, they will submit the dispute to the umpire. An award in writing of any two will determine the amount of loss. We and the ***insured*** will each pay his chosen appraiser and will bear equally the other expenses of the appraisal and umpire.

We will not waive our rights by any of our acts relating to appraisal.

(DE 21-5 at 18 (emphasis in original); DE 42-1 at 20 (same).)  The policies further provide that "[s]uit will not lie against us unless the policy terms have been complied with and until 30 days after proof of loss is filed and the amount of *loss* is determined."  (DE 21-5 at 18 (emphasis in original); DE 42-1 at 20 (same).)

Plaintiff See reported his claim to GEICO General on September 18, 2020.  (DE 76 at 5 ¶ 1.) After declaring Plaintiff See's vehicle a total loss, GEICO General issued payment to Plaintiff See's lien holder on September 29, 2020 and issued an additional payment to Plaintiff See on October 6, 2020.  (*Id.*) Likewise, Plaintiff Cristiano reported his claim to GEICO General on October 7, 2018.  (*Id.* ¶ 3.)  GEICO General then declared Plaintiff Cristiano's vehicle a total loss and issued payment to Plaintiff Cristiano's lien holder on October 17, 2018 and issued an additional payment to Plaintiff Cristiano on October 31, 2018.  (*Id.*)

After Plaintiff See filed the initial complaint in the present lawsuit, Defendants' counsel sent Plaintiffs' counsel a letter dated January 19, 2021, citing the appraisal clause and demanding appraisal of Plaintiff See's loss.  (DE 77 at 5–6.)  Similarly, after Plaintiff Cristiano was added as a party in the amended complaint, Defendants' counsel sent a nearly identical letter to Plaintiffs' counsel on March 15, 2021, citing the appraisal clause and demanding appraisal of Plaintiff Cristiano's loss.  (*Id.* at 10–11.)  In both instances, Plaintiffs' counsel responded that Defendants' appraisal demand "f[ell] well outside the time period it chose to include in [their] contracts" and that Plaintiffs "ha[d] no obligation to participate in an appraisal process."  (*Id.* 8, 13.)

## II.    LEGAL STANDARDS

### A.  Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. More is required.

Before moving forward, the Court must first address whether certain documents extraneous to the amended complaint may be considered here. In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Courts may, however, consider extrinsic documents on a motion to dismiss if the material is integral to the complaint. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019). For a document to be "integral" to the complaint, the pleading must "'rel[y] heavily upon its terms and effect.'" *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). In a similar vein, courts may also consider any documents that are attached to the complaint. *Lohan v. Perez*, 924 F. Supp. 2d 447, 452–53 (E.D.N.Y. 2013).

In addition to documents integral and attached to the complaint, courts may consider documents which are matters of public record. *Boyd v. J.E. Robert Co.*, No. 05–CV–2455 (KAM)(RER), 2011 WL 477547, at *5 (E.D.N.Y. Feb. 2, 2011) (adopting report and recommendation). "Courts that consider matters of public record in a Rule 12(b)(6) motion are limited to things such as statutes, case law, city charters, city ordinances, criminal case dispositions, letter decisions of government agencies, published reports, records of administrative agencies, or pleadings in another action." *Bebry v. ALJAC LLC*, 954 F. Supp. 2d 173, 176 (E.D.N.Y. 2013) (internal quotation marks, brackets, and citation omitted). Even when courts do consider public records at the motion to dismiss stage, they may consider them "only to establish their existence and legal effect, or to determine what statements they contained . . . not for the

truth of the matters asserted." *Liang v. City of N.Y.*, No. 10–CV–3089 (ENV)(VVP), 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (internal quotation marks, brackets, and citation omitted).

Here, the amended complaint makes repeated reference to the Plaintiffs' respective insurance policies and CCC valuation reports.  (*See generally* DE 21.)  Plaintiff See's insurance policy and both Plaintiffs' CCC valuation reports are attached to the amended complaint and therefore may be considered at the motion to dismiss stage.  *Lohan*, 924 F. Supp. 2d at 452–53.  Although Plaintiff Cristiano's insurance policy is not similarly appended to the amended complaint, it may nonetheless be considered as integral to the amended complaint given Plaintiffs' heavy reliance on its terms.  *Palin*, 940 F.3d at 811. Both parties appear to be in accord that these documents are completely in bounds for Defendants' motion to dismiss,[2] and they therefore may be considered at this stage.

Additionally, Defendants urge the Court to consider as a public record a letter dated October 24, 1995, purportedly from the New York Superintendent of Insurance approving CCC's "computerized valuation system."  (DE 42 at 10 fn.3; DE 42-1 at 2.)  The Court concludes, however, that this letter does not constitute the type of public record that may be considered at the motion to dismiss stage, namely statutes, case law, city charters, city ordinances, criminal case dispositions, letter decisions of government agencies, published reports, records of administrative agencies, or pleadings in another action.  *Bebry*, 954 F. Supp. 2d at 176.  Indeed, the Court can glean from the letter only that it was sent from the New York Superintendent of Insurance to CCC and its counsel—there is no indication that it is otherwise publicly available.  Moreover, the letter, as noted above, was sent *twenty-seven* years ago.  Thus, even if the Court could consider it, the letter would have little probative value as to the present dispute. Therefore, the undersigned will not consider this letter in assessing Defendants' motion to dismiss and makes that recommendation to the District Judge as well.

---

[2] Indeed, Defendants—not Plaintiffs—include and rely on Plaintiff Cristiano's insurance policy in support of their motion to dismiss.  (DE 42-1 at 4–39.)

**B.  Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255 (citation omitted).

The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor.  *Id.* at 257.  If the movant provides such affirmative evidence, then "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact."  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

## III.    DISCUSSION

As noted above, Defendants have moved to dismiss Plaintiffs' amended complaint in its entirety, to strike certain allegations pertaining to various GEICO entities throughout the amended complaint, and for summary judgment on the appraisal issue.  The Court will discuss each motion in turn.  However, as a threshold matter, the Court first considers the parties' dispute over whether Defendants Government

Employees and GEICO General may be treated as a "common enterprise" for the purposes of the motions to dismiss and to strike only.  The Court will then turn to the summary judgment motion on the appraisal issue.

### A.  Common Enterprise Allegations

A common thread throughout the parties' arguments is a dispute about whether Defendants Government Employees and GEICO General may be treated as a "common enterprise"— if so, Plaintiffs' claims against Government Employees may proceed; otherwise, they may not.  For example, Defendants contend that Plaintiffs' breach of contract claim against Government Employees must fail because Plaintiffs have not alleged the existence of a contractual relationship between themselves and that entity.  (DE 42 at 10–11.)  Plaintiffs respond that they have sufficiently alleged facts to establish, at this stage of litigation, that Government Employees and GEICO General operate as a common enterprise, and that they therefore have a contractual relationship with both entities.  (DE 43 at 13–14.)  Plaintiffs, in other words, seek to hold Government Employees liable for the alleged breach of contract on the part of GEICO General.  While the Court concludes that Plaintiffs have failed to allege facts supporting a complete domination theory so as to treat Defendants as one, Plaintiffs have sufficiently alleged facts to support an agency theory to allow this action to move forward against all Defendants.

### i.  Complete Domination

Ordinarily, "[w]ithout a contractual relationship, there can be no alleged breach."  *Inter Impex S.A.E. v. Comtrade Corp.*, No. 00 Civ. 0133(GBD), 2004 WL 2793213, at *4 (S.D.N.Y. Dec. 6, 2004).  In the same vein, "'a parent corporation and its subsidiary are [generally] regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both'"  *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 498 (S.D.N.Y. 2015) (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993); *see also Celi v. Canadian Occidental Petroleum Ltd.*, 804 F. Supp. 465, 468 (E.D.N.Y. 1992) ("In New York, there is a 'presumption of separateness' to related corporations.").  A "party seeking to hold a parent liable for a subsidiary's breach of contract bears the burden of establishing that the parent corporation exercised complete domination of

the subsidiary corporation in respect to the transaction attacked; and . . . that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Hatteras Enters., Inc. v. Forsythe Cosm. Grp., Ltd.*, 2:15-cv-05887 (ADS)(ARL), 2019 WL 9443845, at *6 (E.D.N.Y. Jan. 14, 2019) (internal quotation marks, brackets, and citation omitted). Courts consider the following factors in determining whether complete domination of the subsidiary corporation has been sufficiently alleged:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity (or individual), and (10) intermingling of property between the entities.

*Id.* (citing *Rays Trading (H.K.) Co., Ltd. v. Judy-Philippine, Inc.*, No. 98-cv-0170, 1998 WL 355422, at *3–4 (S.D.N.Y. July 2, 1998)).

Here, Plaintiffs have not alleged the existence of an agreement with Government Employees. Rather, GEICO General is the issuing insurance policy entity as stated on Plaintiffs' respective declarations. (*See* DE 21-5 at 3 (Plaintiff See declaration identifying GEICO General as insurer); *id.* at 10 ("We, the Company named in the Declarations to this policy, make this agreement with you, the policy holder."); DE 42-1 at 5 (Plaintiff Cristiano declaration identifying GEICO General as insurer); *id.* at 12 ("We, the Company named in the Declarations to this policy, make this agreement with you, the policy holder.").) Thus, at first blush, Plaintiffs cannot bring a breach of contract claim against Government Employees.

Moreover, the allegations in the amended complaint are insufficient to support the theory that Government Employees completely dominates GEICO General so as to hold Government Employees liable for the alleged breach of contract by GEICO General. Specifically, Plaintiffs allege that Government Employees "performs substantially all insurance operations" of GEICO General; only one entity, "GEICO Insurance Agency," is registered to do business with the New York Department of State; all GEICO entities have the same telephone number, operate from the same address, and have the same website; Government Employees adjusts total loss automobile claims made on policies of insurance

10

issued by any of its subsidiaries, including GEICO General; and that Plaintiffs' policies were signed by both the President and Secretary of Government Employees.  (DE 21 at 5–7.)  These allegations touch on only two of the relevant factors, namely, having overlapping directors and having a common office space, address, and telephone number.  Plaintiffs have not alleged a disregard of corporate formalities, inadequate capitalization, the intermingling of funds, the degree of discretion that GEICO General exercises, that the entities do not operate at arms-length, whether the entities operate as two separate profit centers, whether Government Employees pays or guarantees GEICO General's debts, or if there is an intermingling of property between the entities.  *See White v. Nat'l Home Protection, Inc.*, No. 09 Civ. 4070(SHS), 2010 WL 1706195, at *5 (S.D.N.Y. Apr. 21, 2010) (holding that plaintiff failed to allege complete domination in "mak[ing] no allegation that the individual defendants intermingled personal and corporate funds, failed to deal with NHP on an arms-length basis, or in any meaningful way abused or disregarded the corporate form").  Thus, Plaintiffs may not proceed on a complete domination theory.

      **ii.**          **Agency Theory**

Separate and distinct from a complete domination theory is an agency theory, whereby a parent company, the principal, will be bound by an agreement entered into by its subsidiary, the agent, where the agent acts with actual or apparent authority.  *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996).  "Actual authority is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, [it] is privileged to do because of the principal's manifestations to [it]," while "[a]pparent authority arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the [entity] purporting to act for [it]."  *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68–69 (2d Cir. 2003) (internal quotation marks and citations

omitted).  Although this was not expressly raised in those terms by Plaintiffs, the arguments made could be reasonably construed to be viewed as agency arguments.[3]

To survive a motion to dismiss riding on an agency theory, a plaintiff must allege facts, which, if proven, would show that the plaintiff "reasonably believed that [the agent] entered into the agreement with [the plaintiff] on behalf of [the principal] and not on its own behalf."  *Id.* at 69.  Because "an outsider will [ordinarily] not be privy to the details of what conversation or conduct took place between a principal and the agent," *Craig v. Sandals Resorts Int'l*, 69 F. Supp. 3d 322, 328 (E.D.N.Y. 2014), "a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and [his or her] pleadings may rely upon facts that would constitute circumstantial evidence of authority," to sufficiently allege an actual agency relationship, *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012*), aff'd sub nom. Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88 (2d Cir. 2013) (summary order).

Here, Plaintiffs rely on a salvo of circumstantial allegations which, considered as a whole, plausibly support an agency theory for Plaintiffs' breach of contract claim against Government Employees.  To reiterate, Plaintiffs allege in the amended complaint that Government Employees "performs substantially all insurance operations" of GEICO General; only one entity, "GEICO Insurance Agency," is registered to do business with the New York Department of State; all GEICO entities have the same telephone number, operate from the same address, and have the same website; Government Employees adjusts total loss automobile claims made on policies of insurance issued by any of its subsidiaries, including GEICO General; and that Plaintiffs' policies were signed by both the President and Secretary of Government Employees.  (DE 21 at 5–7.)  Although these allegations do not support a theory of complete domination, they do support the inference that an agency relationship exists between

---

[3]"When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

Defendants Government Employees and GEICO General.  This inference grows stronger upon a cursory review of Plaintiffs' policies, which contain a cover letter titled "New York Automobile Insurance Policy" followed by a listing of the GEICO entities, "Government Employees Insurance Company," "GEICO Casualty Company," "GEICO Indemnity Company, and "GEICO General Insurance Company." (DE 21-5 at 7; *see Harte v. Ocwen Fin. Corp.*, 13-CV-5410 (MKB) (RER), 2016 WL 1275045, at *7 (E.D.N.Y. Mar. 31, 2016) (holding that circumstantial evidence, paired with the entities "shared physical address, executive managers, telephone numbers, branding and internet presence" supported an inference of actual authority) (adopting report and recommendation).)  Thus, taking as true Plaintiffs' allegations regarding the corporate structure of Defendants Government Employees and GEICO General and the commonalities of the entities, the Court concludes that Plaintiffs have pled facts that "'raise a sufficient inference that some sort of agency relationship existed between' [Defendants] that covered the conduct at issue in the" amended complaint.  *Id.* at *6 (quoting *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010)).

In short, despite the absence of a contractual relationship with Plaintiffs and Government Employees, Plaintiffs' claims should nonetheless be permitted to move forward against all Defendants based on an agency theory.  That claim is plausible as a matter of pleading.  Accordingly, the undersigned respectfully recommends that Defendants' motion to dismiss be denied to the extent it seeks dismissal of claims against Government Employees for lack of a contractual relationship with Plaintiffs.

### B.  Defendants' Motion to Dismiss

#### i.    Breach of Contract Claim

Defendants assert that Plaintiffs have failed to plausibly allege that Defendants breached the insurance policies because the allegations of actual cash value underpayment are conclusory.  (DE 42 at 4.)  Plaintiffs assert that they have indeed made out breach of contract claims by alleging that, because CCC "set[s] comparable vehicle[s] to some unspecified condition deemed more valuable than average private condition . . . result[ing] in significant negative adjustments to the value of each comparable

vehicle," Defendants, in turn, "systemically undervalue claims and fail to pay insureds the actual cash value they are owed under the policy." (DE 43 at 15–16 (internal quotation marks omitted and capitalization altered).)

To make out a breach of contract claim under New York law, a plaintiff must satisfy the following elements: (1) the formation of a contract between the parties; (2) performance by the plaintiff; (3) failure of defendant to perform; and (4) damages. *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015). Breach of contract claims based on conclusory allegations that a breach occurred cannot withstand a motion to dismiss. *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 115 (S.D.N.Y. 2021) ("A breach of contract claim cannot rest on a conclusory statement that the defendant breached a contract."); *see Barlow v. Gov't Emps. Ins. Co.*, 19-CV-3349 (PKC) (RML), 2020 WL 5802274, at *3 (E.D.N.Y. Sept. 29, 2020) ("A complaint alleging a breach -of-contract must 'identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached.'") (quoting *Wallert v. Atlan*, 141 F. Supp. 3d 258, 286 (S.D.N.Y. 2015)). New York law treats insurance policies "'like any other contract,'" and therefore typical principles of contract law apply. *Lexington Ins. Co.*, 550 F. Supp. 3d at 115 (quoting *Traynor v. John Hancock Mut. Life Ins. Co.*, 273 N.Y. 230, 7 N.E.2d 112, 114 (1937)).

The Court concludes that Plaintiffs have plausibly alleged a breach of the insurance policies. Under the policies, Defendants are required to pay Plaintiffs the "actual cash value" for total loss vehicles. (DE 21-5 at 16–17 (See insurance policy); DE 42-1 at 17–18 (Cristiano insurance policy).) Plaintiffs' breach of contract claims therefore center around the allegation that "Defendants settled each Plaintiffs' claim . . . for less than the actual cash value required by the insurance contract." (DE 21 ¶ 76.) To reach this conclusion, Plaintiffs allege that CCC, when crafting the valuation reports, "simply assume[s]" that each comparable vehicle is "in better condition than average private condition without any basis to measure, discern, or specify the conditions of the comparable vehicles," because it does not "descri[be] or itemiz[e] . . . the condition[s] of the comparable vehicles," as compared to the analysis of the "nine components utilized when evaluating the condition of the loss vehicle." (*Id.* ¶ 53.) Plaintiffs further

allege that CCC's failure to properly assess the conditions of the comparable vehicles necessarily leads to Defendants' breach of the policies as they paid Plaintiffs less than the actual cash value for their total loss vehicles. Specifically, Plaintiffs' allegations that CCC's so-called "negative condition adjustments," (*id.* ¶ 54), which are done "uniformly" among the comparable vehicles, (*id.* ¶ 53), lead to a depreciated base vehicle value *before* CCC performs the nine-component inspection on the total loss vehicle. Plaintiffs allege that this occurs when CCC sets each comparable vehicle to "an undescribed and undisclosed condition deemed more valuable" than the average private condition that the total loss vehicle is assessed against, (*id.* ¶ 54), resulting in a valuation that is *less* than the actual cash value by a difference of the negative condition adjustment. Based on this deflated figure on CCC's valuation report, Plaintiffs conclude that "Defendants settled each Plaintiffs' claim . . . for less than the actual cash value required by the insurance contract." (*Id.* ¶ 76.) Taken as true, these allegations plausibly make out a claim that Defendants breached the insurance contract by failing to pay Plaintiffs the actual cash value for their total loss vehicles, as they "nudge [Plaintiffs' breach of contract claim] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Defendants' arguments to the contrary are unpersuasive. Defendants urge that a reading of the CCC valuation reports shows that the alleged "undocumented" and "unexplained" negative condition adjustments are, in fact, documented and explained. (DE 42 at 5–6.) Defendants reason that, because the comparable vehicles were advertised for sale at dealerships, the condition adjustments operate to set the comparable vehicles from "dealer-ready condition" to average private condition. (*Id.* at 6.) Defendants' argument, however, is flawed because nowhere in the CCC valuation reports is "dealer-ready condition" defined. (*See generally* DE 21-7; DE 21-8.) Absent such a definition, Defendants are effectively refusing to take Plaintiffs' allegations of CCC's baseless, uniform downward price adjustments as true, which must be done at the motion to dismiss stage. Similarly, Defendants' contention that "Plaintiffs' . . . alleged no facts suggesting the [fourteen] dealer-advertised comparable vehicles were in a condition other than dealer-ready condition" ignores Plaintiffs' repeated allegations that CCC's system of setting the average private condition for the comparable vehicles higher (before applying the alleged blanket

15

negative condition adjustments) than the average private condition for the loss vehicles leads to a deflated actual loss value.  (*See, e.g.*, DE 21 ¶¶ 54, 60, 76.)  In short, the Court concludes that Plaintiffs have plausibly alleged that Defendants breached the insurance policy by paying less than actual loss value for the total loss vehicles.[4]

Accordingly, the undersigned respectfully recommends that Defendants' motion to dismiss Plaintiffs' breach of contract claim be denied.

### ii.    New York General Business Law § 349 Claims

New York General Business Law Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus. Law § 349(a).  To plausibly state a claim under Section 349, "'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, 21-1082-cv, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022) (summary order) (citation omitted).  "An action under GBL [Section] 349 is not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), "'but need only meet the bare-bones notice-pleading requirements of Rule 8(a).'"  *Kronenberg v. Allstate Ins. Co.*, 18-CV-6899 (NGG) (JO), 2020 WL 1234603, at *2 (E.D.N.Y. Mar. 13, 2020) (citing *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 128 (E.D.N.Y. 2011)).  Defendants' contentions in favor of dismissal are appropriately distilled into two arguments, namely that Plaintiffs have failed to adequately allege the materially misleading and injury prongs of a Section 349 claim.  (DE 42 at 12–15.)  The Court will address each argument in turn.

---

[4] Indeed, other district courts have concluded that allegations in complaints in similar cases are sufficient for purposes of pleading.  *See, e.g.*, *Lundquist v. First Nat'l Ins. Co. of Am.*, CASE NO. 18-5301 RJB, 2018 WL 3344791, at *5 (W.D. Wash. July 9, 2018) (denying breach of contract claim where defendant allegedly violated Washington state law by failing to itemize CCC's deduction and plaintiff alleged that he was damaged as a result).  Discovery could reveal, of course, that Plaintiffs were paid the correct total loss value—or were possibly even overpaid based on the alleged uniform negative condition adjustments.  *See Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022) (affirming denial of class certification and noting that "[b]ecause [defendant] only owed each putative class member the actual cash value of his or her car, if a putative class member was given that amount or more, then he or she cannot win on the merits").  Because Plaintiffs' allegations must be taken as true at this stage, that is an issue to be resolved once the benefits of discovery come to pass.

16

### a.   Materially Misleading

"Whether an act is materially misleading is defined objectively and looks to whether the act is likely to mislead a reasonable consumer acting reasonably under the circumstances." *Chery v. Conduent Educ. Servs., LLC*, 1:18-CV-75, 2022 WL 179876, at *8 (N.D.N.Y. Jan. 20, 2022) (internal quotation marks and citation omitted); *see Kronenberg*¸ 2020 WL 1234603, at *2 ("The standard for whether an act or practice is materially misleading is objective; it requires a showing that a reasonable consumer would have been misled by the defendant's conduct.") (internal quotation marks, brackets, and citation omitted). To satisfy the materially misleading element, a plaintiff need not allege that the defendant's conduct was intentionally misleading, only that it would be misleading or deceptive to a reasonable consumer. *See People v. Wilco Energy Corp.*, 284 A.D.2d 469, 471, 728 N.Y.S.2d 471, 473 (2d Dep't 2001). Because the inquiry hinges on the reasonableness of a consumer, "[c]ourts have generally held that since the materially misleading conduct factor requires a reasonableness analysis best suited for a jury, it cannot be resolved on a motion to dismiss." *Carrillo v. Wells Fargo Bank, N.A.*, No. 18-CV-3095 (SJF) (SIL), 2019 WL 3714801, at *7 (E.D.N.Y. May 10, 2019) (citation and quotation marks omitted) (alterations adopted), *report and recommendation adopted*, 2019 WL 3927369 (E.D.N.Y. Aug. 20, 2019). *But see Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (noting that "a court *may* determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer") (emphasis added).

*Kronenberg v. Allstate Insurance Company* is on point, instructive, and persuasive. In *Kronenberg*, as here, plaintiff brought a class action alleging that defendant, an insurance company, violated New York law by systematically undervaluing vehicles totaled in accidents. 2020 WL 1234603 at *1. Plaintiff alleged that defendant's reliance on CCC valuation reports, which "subtracted a uniform condition adjustment of $610 from . . . two [compared] dealer vehicles . . . without itemizing or indicating the basis of the adjustment," led to a reduction of the value of the total loss vehicle to the benefit of defendant. *Id.* In concluding that plaintiff adequately alleged the materially misleading portion of his Section 349 claim, the court noted that the insurance policy at issue included "actual cash value" collision

coverage. *Id.* at *3. Thus, taking plaintiff's allegations regarding the "uniform condition adjustment" as true, the court found that a "reasonable consumer expecting actual cash value for a totaled vehicle would be misled by [d]efendants' valuation method, which, relying on . . . an unexplained condition adjustment, produces an artificially low value for the vehicle." *Id.*

Plaintiffs have adequately alleged that Defendants engaged in conduct that would materially mislead a reasonable consumer. As explained above, Defendants agreed, under the respective insurance policies, to pay Plaintiffs the actual cash value for total loss vehicles. (DE 25-1 at 16–17 (See insurance policy); DE 42-1 at 17–18 (Cristiano insurance policy).) A reasonable consumer, thus, would expect to receive the actual cash value for his or her vehicle in the event of a collision. Taking Plaintiffs' allegations as true, CCC's system of assuming all comparable vehicles are in a better condition than average private condition and uniformly applying negative condition adjustments likely misleads consumers given Defendants' reliance on the valuation reports in purporting to pay Plaintiffs actual cash value for their vehicles. In other words, as in *Kronenberg*, "a reasonable consumer expecting actual cash value for a totaled vehicle would be misled by Defendants' valuation method" which, as alleged, "produces an artificially low value for the vehicle." 2020 WL 1234603 at *3. This is particularly so in light of Plaintiffs' allegations that Defendants represented that they were *increasing* the assessed value of Plaintiffs' respective vehicles when, as alleged, this was not so. (DE 21 ¶¶ 32, 44.)

Defendants' assertion that Plaintiffs failed to plausibly allege misleading conduct misses the mark. Defendants specifically claim that a "[r]eview of the CCC [valuation reports] reveals they are transparent, provide examples, and there is nothing hidden or deceptive about how condition adjustments were made for" Plaintiffs' vehicles. (DE 42 at 12.) Defendants' argument regarding the transparency of the condition adjustments hinges on one phrase in the valuation report, which states that "the condition adjustment sets that comparable vehicle to average private condition, which the loss vehicle is also compared to in the vehicle condition section." (DE 21-7 at 10–11; DE 21-8 at 10–11.) As Plaintiffs allege, however, this statement may mislead a reasonable consumer given that condition adjustments made to comparable vehicles, according to this statement, sets the comparable vehicles to average private

condition, while the condition adjustments made to the loss vehicle are made *after* it is set to average private condition. Thus, while the CCC valuation statements give the impression that, in Defendants' words, an "apples-to-apples" comparison is made between the loss vehicle and comparable vehicles (DE 42 at 6), Plaintiffs allege that, in reality, the average private condition is set as an "undescribed and undisclosed condition deemed more valuable, resulting in a significant negative condition adjustment" for the loss vehicle (DE 21 ¶ 54). Taking Plaintiffs' allegations as true, a reasonable consumer expecting actual cash value for their loss vehicle would be misled by Defendants' valuation process even after reading the condition adjustment statement on the CCC report. *See Kronenberg*, 2020 WL 1234603 at *4 (denying defendant's motion to dismiss Section 349 claim and noting that "[w]hile [p]laintiff was aware of the condition adjustment deductions applied to comparable vehicles in the CCC report, he received conflicting and unsatisfactory explanations for the deductions and alleges they were part of a deceptive practice to lower the value of [p]laintiff's claim").

Further, Defendants' contention that Plaintiffs' claims must fail because they are based on opinion misconstrues Plaintiffs' allegations. First, Plaintiffs are not focused on CCC's general assessment, *i.e.*, opinion, of the comparable vehicles. Indeed, Plaintiffs take no issue with CCC's adjustment of the comparable vehicles' advertised prices based on attributes such as mileage and options. (DE 21 ¶ 34.) Rather, Plaintiffs' allegations revolve around CCC's alleged use of unexplained, blanket condition adjustments which work to produce an artificially low value for the loss vehicle. (*Id.* ¶ 84.) Drawing from common sense and experience—as Defendants urge the Court to do—paired with Plaintiffs' allegations assumed to be true, it becomes clear that applying the *same* downward condition adjustment for three separate comparable vehicles is not an "opinion" of CCC but rather a "hidden monetary adjustment," and thus subject to Section 349. (*Id.*) And second, Plaintiffs allege that Defendants "deceived Plaintiffs . . . by representing that [their] payments, which were reduced by unsupported condition adjustments, represented the actual cash value of their totaled vehicles." (*Id.* ¶ 86.) One would be hard-pressed to consider *actual* cash value an "opinion" as Defendants suggest.

In sum, Plaintiffs have adequately alleged facts to satisfy the second element of their Section 349 claim.

### b. Injury

Defendants aim the remainder of their arguments at the injury prong of Section 349. In Defendants' view, Plaintiffs have failed to satisfy the injury element of Section 349 because (1) even if Defendants engaged in deceptive conduct, Plaintiffs have not alleged that Defendants underpaid them for the value of their vehicles; and (2) Plaintiffs have failed to allege a monetary loss independent of the loss caused by the alleged breach of contract. (DE 42 at 12, 14–15.)

Defendants' first argument is easily disposed of. Contrary to Defendants' assertion that "Plaintiffs failed to allege that [Defendants] underpaid them for the value of their vehicle," (*Id.* at 12), the amended complaint is teeming with allegations that Defendants underpaid Plaintiffs for their total loss vehicles based on their allegedly deceptive practices. (*See, e.g.*, DE 21 ¶¶ 6–7, 50, 52, 60, 76.) These allegations belie Defendants' contention. Moreover, Defendants' reliance on *In re Sling Media Slingbox Advertising Litigation* ("*In re Sling*") and *Michelo v. National Collegiate Student Loan Trust 2007-2* is misplaced. Plaintiffs' Section 349 claim in *In re Sling* was deficient because, rather than alleging a cognizable injury such as pecuniary loss, plaintiffs merely alleged that defendants' alleged conduct subjected them to unwanted advertisements. 202 F. Supp. 3d 352, 361 (S.D.N.Y. 2016). Similarly, in *Michelo*, plaintiff's Section 349 claim was dismissed because her allegations that she feared being subjected to possible future wage garnishment based on defendants' alleged conduct was too speculative to constitute actual injury under Section 349. 419 F. Supp. 3d 668, 708–09. Plaintiffs' allegations here stand in stark contrast to these cases. Rather than allege non-cognizable injury such as unwanted advertisements or speculation of future harm, Plaintiffs have plausibly alleged that Defendants' alleged deceptive conduct led to underpayment for their loss vehicles, *i.e.* pecuniary loss. *See In re Sling*, 202 F. Supp. 3d at 360 (noting that pecuniary loss is a cognizable legal injury). In short, Plaintiffs have adequately alleged that Defendants underpaid them for their total loss vehicles.

Defendants' second argument is equally unpersuasive in light of recent Second Circuit guidance. Defendants argue that Plaintiffs have failed to allege a loss independent of the alleged breach of contract. (DE 42 at 14.)  However, the Second Circuit recently clarified in *Milligan v. GEICO General Insurance Company* that plaintiffs asserting breach of contract and Section 349 claims are not obligated to "'allege an injury under § 349 independent of their contract damages.'"  20-3726-cv, 2022 WL 433289, at *6 (2d Cir. Feb. 14, 2022) (brackets omitted) (quoting *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 125 (2d Cir. 2017)).  There—as here—plaintiff, in asserting breach of contract and Section 349 claims, alleged that she was denied services for which she contracted, *i.e.*, she was not paid the total loss purchase price of her totaled vehicle due to a misleading CCC valuation.  *Id.* at *1.  The Second Circuit concluded that plaintiff had "'alleged both a monetary loss stemming from the deceptive practice and the [d]efendant's failure to deliver contracted-for services,'" and thus properly alleged injury under Section 349.  *Id.* at *6 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015)).  *Milligan* is on-point and compels a conclusion that Plaintiffs have properly alleged injury here.  Indeed, Defendants would be disingenuous to argue otherwise, as they concede that the facts of *Milligan*—which, at the time, was still pending on appeal—are sufficiently analogous to the present dispute.  (*See* DE 42 at 15 (relying on *Milligan* in asserting that Plaintiffs' sole injury stems from the alleged breach of contract) (quoting *Milligan v. GEICO Ins. Co.*, 16-cv-240 (DLI)(RML), 2020 WL 5878406, at *10 (E.D.N.Y. Sept. 30, 2020), *aff'd in part, vacated in part*, 2022 WL 433289 (2d Cir. Feb. 14, 2022)).)

In short, Plaintiffs have sufficiently alleged that they suffered an injury under Section 349.

Based upon the foregoing, the Court concludes that Plaintiffs have adequately pled their Section 349 claims.  As such, the undersigned respectfully recommends that Defendants' motion to dismiss Plaintiffs' Section 349 claim be denied.

**C.  Defendants' Motion to Strike**

Defendants move, pursuant to Federal Rules of Civil Procedure 12(f) and 23(d)(1)(D), to strike from Plaintiffs' complaint allegations regarding (1) Government Employees; (2) GEICO entities that are not named as defendants, namely GEICO Casualty and GEICO Indemnity; and (3) third-party claimants

as members of the Section 349 class and subclass.  (DE 42 at 20.)  The Court has already addressed the

propriety of the allegations against Government Employees and therefore respectfully recommends that

that portion of Defendants' motion to strike be denied.  *See supra.*

Under Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading . . . any

redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Similarly, Rule

23(d)(1)(D) authorizes courts to "issue orders that . . . require the pleadings be amended to eliminate

allegations about representation of absent persons and that the action proceed accordingly." Fed. R. Civ.

P. 23(d)(1)(D).  Whether to grant a motion to strike pursuant to Rule 12(f) is a decision within the district

court's discretion.  *Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 63 (E.D.N.Y. 2011)

(citing *E.E.O.C. v. Bay Ridge Toyota, Inc.*, 327 F. Supp. 2d 167, 170 (E.D.N.Y. 2004)).  That said,

> motions to strike under Rule 12(f) are rarely successful—particularly in the class-action
> context where such a motion requires a reviewing court to preemptively terminate the class
> aspects of litigation, solely on the basis of what is alleged in the complaint, and before
> plaintiffs are permitted to complete discovery to which they would otherwise be entitled to
> on questions relevant to class certification.

*Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 292 (S.D.N.Y. 2015) (internal

quotation marks, brackets, footnotes, and citations omitted); *accord Belfiore v. Proctor & Gamble Co.*, 94

F. Supp. 3d 440, 447 (E.D.N.Y. Mar. 25, 2015) (noting that "[c]ourts rarely grant motions to strike

pursuant to Federal Rule of Civil Procedure 12(f)" and that "[a] motion to strike class allegations under

Rule 12(f) is even more disfavored") (internal quotation marks and citations omitted).

Given this preference against striking class allegations, "'to succeed on a motion to strike class

allegations, a defendant must demonstrate from the face of the complaint that it would be impossible to

certify the alleged class regardless of the facts that plaintiffs may be able to obtain during discovery.'"

*Carrillo*, 2019 WL 3714801 at *9 (quoting *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511

(S.D.N.Y. 2015)).  Courts in the Second Circuit, though, "have repeatedly held [that] a determination of

whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when

a more complete factual record can aid the Court in making this determination," *Greene v. Gerber Prod.*

*Co.*, 262 F. Supp. 3d 38, 68 (E.D.N.Y. 2017) (collecting cases) (internal quotation marks omitted), and, as

a result, "motions to strike class allegations are often denied as premature," *Reynolds*, 136 F. Supp. 3d at 511–12.

With these principles in mind, the Court addresses Defendants' motion to strike the allegations regarding GEICO entities that are not named as defendants and allegations concerning third-party claimants as members of the Section 349 class and subclass.

### i.    Allegations Concerning Non-Party GEICO Entities

Defendants move to strike allegations concerning GEICO Casualty and GEICO Indemnity because "Plaintiffs did not even attempt to assert claims against [these entities] in their [a]mended [c]omplaint," only alleged that they were subsidiaries of Government Employees, and, therefore, cannot maintain class claims against them simply because they are entities related to Defendants. (DE 42 at 22.) Plaintiffs respond that their "reference to non-parties GEICO Casualty or GEICO Indemnity Company are for the purpose of explaining the relationship between the GEICO [c]ompanies, and providing pertinent and clarifying details regarding [Defendant] Government Employees' role as the sole entity adjusting claims for GEICO." (DE 43 at 25.)

The Court concludes that striking the allegations concerning GEICO Casualty or GEICO Indemnity Company is inappropriate at this time. Plaintiffs' allegations concerning the alleged intertwinement of each of the GEICO entities provide relevant background information and lay the groundwork for their common enterprise theory. Such allegations accordingly cannot be considered immaterial to the amended complaint. *See Lynch*, 278 F.R.D. at 67 (declining to strike background relevant to establishing plaintiff's theory of the case). In a similar vein, a plain reading of the amended complaint makes clear that Plaintiffs' class allegations concerning GEICO Casualty or GEICO Indemnity Company are grounded in Plaintiffs' common enterprise theory. This is particularly so given that the class claims "against GEICO Casualty or GEICO Indemnity Company," as Defendants read them, (DE 42 at 22) are, in truth, being asserted against Defendants Government Employees and GEICO General (DE 21 ¶ 61), presumably under the common enterprise theory. As such, the Court concludes that striking such allegations, which bear on the issue of class certification, would be premature at this stage as

"Defendants . . . cannot 'demonstrate from the face of the [c]omplaint that it would be impossible to certify the alleged class regardless of the facts Plaintiffs may be able to obtain during discovery.'" *Kronenberg*, 2020 WL 1234603 at *6 (quoting *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015)).

### ii.    Allegations Concerning Third-Party Claimants

Defendants argue that Plaintiffs' allegations concerning third-party claimants should be stricken because their claims "are based on first-party insurance claims they submitted to their insurer." (DE 42 at 23 (emphasis omitted).) Most of Defendants' arguments center around Plaintiffs' ability to satisfy the class certification requirements of Rule 23—*i.e.*, "the criteria of numerosity, commonality, typicality, and adequacy." *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 206 (E.D.N.Y. 2015) (citation omitted). Such arguments, however, are premature because they "'mirror the class certification inquiry'" as they "are 'the same ones that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b).'" *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 173 (S.D.N.Y. 2019) (quoting *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013)). The conclusion that these arguments mirror the class certification inquiry is highlighted by the case law cited by Defendants, which almost exclusively concerns the class certification—rather than motion to dismiss—stage of litigation.[5]

Defendants' argument that third-party claimants are not consumers under Section 349, and therefore cannot maintain such claims, is more compelling but nonetheless insufficient to warrant the striking of Plaintiffs' class allegations. Defendants interpret Section 349 as inapplicable to third-party claimants because they are "not evaluating or exercising market options." (DE 42 at 24.) The latest

---

[5] *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 151 (1982) (reviewing district court's decision to certify matter as class action); *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (reviewing district court's decision to decertify class action); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 55 (reviewing, *inter alia*, district court's denial class action certification). Defendants' reliance on *Kuhne v. Midland Credit Mgmt., Inc.*, No. 06 Civ. 5888(DC), 2007 WL 2274873 (S.D.N.Y. Aug. 9, 2007) is misplaced because, as discussed below, it is unclear at this stage whether a third-party claimant qualifies as a consumer under Section 349. If they do, then there is no issue under *Kuhne* regarding the Plaintiffs' representation of the class.

guidance from the New York Court of Appeals in *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 171 N.E.3d 1192, 150 N.Y.S.3d 79 (2021) ("*Himmelstein*"), however, undermines Defendants' narrow reading of Section 349. The *Himmelstein* court made clear that—contrary to Defendants' contentions—"there is no textual support in General Business Law [Section] 349 for a limitation on the definition of 'consumer' based on use," namely because "such narrowing of the term 'consumer' would be contrary to the legislative intent to protect the public against all forms of deceptive business practices." *Id.* at 177. The Court also reiterated "that an act or practice is consumer-oriented when it has a broader impact on consumers at large" and that, therefore, Section 349 focuse[es] on the seller's deception and its subsequent impact on consumer decision-making, not on the consumer's ultimate use of a product." *Id.*

In light of the Court of Appeals' expansive interpretation of Section 349 in *Himmelstein*, the Court concludes that a determination of whether the third-party claimants fall within Section 349's purview is premature at this stage. Indeed, Defendants have not "demonstrate[d] from the face of the complaint that it would be *impossible* to certify the alleged class regardless of the facts that plaintiffs may be able to obtain during discovery." *Carrillo*, 2019 WL 3714801 at *9 (emphasis added) (internal quotation marks and citation omitted). Such determination is better suited for the class certification stage after the parties have had an opportunity to conduct discovery.

\* \* \*

In sum, the undersigned respectfully recommends that Defendants' motion to strike be denied in its entirety.

### D. Defendants' Motion for Summary Judgment on the Appraisal Issue

As noted above, the undersigned converted the aspect of Defendants' motion to dismiss regarding the appraisal issue into a motion for summary judgment. Defendants ground this aspect of their motion in Plaintiffs' respective policy appraisal provisions, which state:

> If we and the **insured** do not agree on the amount of *loss*, either may, within 60 days after proof of *loss* is filed, demand an appraisal of the *loss*. In that event, we and the **insured** will each select a competent appraiser. The appraisers will select a competent and

disinterested umpire. The appraisers will state separately the ***actual cash value*** and the amount of the ***loss***. If they fail to agree, they will submit the dispute to the umpire. An award in writing of any two will determine the amount of loss. We and the ***insured*** will each pay his chosen appraiser and will bear equally the other expenses of the appraisal and umpire.

We will not waive our rights by any of our acts relating to appraisal.

(DE 21-5 at 18 (emphasis in original); DE 42-1 at 20 (same).)  The policies further provide that "[s]uit will not lie against us unless the policy terms have been complied with and until 30 days after proof of loss is filed and the amount of ***loss*** is determined."  (DE 21-5 at 18 (emphasis in original); DE 42-1 at 20 (same).)  According to Defendants, this matter is subject to the mandatory appraisal because (1) Defendants timely invoked the arbitration provision; and (2) the alleged disagreement among the parties is over the value of the loss vehicles, a factual issue subject to appraisal.

Defendants' motion for an appraisal fails in the first instance based on the plain language of the appraisal provision paired with precedent interpreting the *exact* policy language.  In *Milligan v. GEICO Insurance Company*, the Honorable Gary R. Brown—writing then as a magistrate judge—interpreted the same appraisal provision language in light of defendant's argument that the complaint in that action constituted the only arguable proof of loss filed by plaintiff.  CV 16-240 (JMA)(GRB), 2017 WL 9939046, at *9–10 (E.D.N.Y. July 14, 2017), *report and recommendation adopted by* 2018 WL 3632690 (E.D.N.Y. Apr. 3, 2019), *aff'd sub nom Milligan v. CCC Info. Servs. Inc.*, 920 F.3d 146 (2d Cir. 2019).[6] Noting that the policy at issue did not define "proof of loss" and that defendant's argument was "undermined by the language of policy providing that '[s]uit will not lie against us unless the policy terms have been complied with and until 30 days after proof of loss is filed and the amount of loss is determined,'" Judge Brown concluded that the filing of the complaint could not constitute proof of loss under the appraisal provision.  *Id.* at *10.  This was particularly so given that "[p]laintiff filed the requisite information and qualified for a substantial payment under the policy many months before [defendant's] demand for an appraisal, rendering that demand untimely" as defendant "paid more than

---

[6] The Court notes that the Second Circuit in *Milligan v. CCC Information Services Inc.* expressly did not reach the question of whether GEICO timely demanded appraisal under the circumstances presented.  920 F.3d at 154 n.6.

$45,000 as a result of the information provided by plaintiff." *Id.*  In short, Judge Brown found that some earlier event—likely the plaintiff's filing of the required claim information followed by defendant's payment of the claims—qualified as the proof of loss event under the policy rather than the filing of the complaint. *Id.*

The Court concludes that, for the same reasons articulated in *Milligan*, there is no genuine dispute of material fact that Defendants' demand for appraisal here was untimely.  The insurance policies at issue do not define "proof of loss."  Liberally construing the notice and proof requirements in favor of the insureds, *id.* (quoting *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Props., LLC*, 381 F. Supp. 2d 250, 259 (S.D.N.Y. 2005)), a plain reading of the insurance policies' provision stating that "[s]uit will not lie against us unless the policy terms have been complied with and until 30 days after proof of loss is filed and the amount of *loss* is determined" (DE 21-5 at 18 (emphasis in original); DE 42-1 at 20 (same))[7] forecloses the possibility of Plaintiffs' complaint filing "exist[ing] both as a proof of loss, which is a condition precedent to the filing complaint, as well as the complaint itself," *Milligan*, 2017 WL 9939046, at *10.  Plaintiffs' promptly provided proof of loss.  (DE 76 at 5 ¶¶ 1, 3.)  Defendants' provision of claims payments after receiving proof of loss—occurring on October 6, 2020 for Plaintiff See and October 31, 2018 for Plaintiff Cristiano (*id.*)—is, under the terms of the insurance policies, the latest possible proof of loss date.  Thus, the latest date Defendants may have demanded appraisal was December 5, 2020 for Plaintiff See and December 30, 2018 for Plaintiff Cristiano, *i.e.*, sixty days from the proof of loss event. Because there is not genuine dispute of material fact that Defendants did not demand appraisal from Plaintiff See until January 19, 2021 and from Plaintiff Cristiano until March 15, 2021 (*id.* ¶¶ 2, 4)—both dates well outside of the sixty-day window—Defendants' appraisal demands were untimely, and Defendants' motion for summary judgment should be denied.

---

[7] Defendants' motion papers conspicuously omit the unfavorable language from this provision, stating that "[t]he [p]olicies state that '[s]uit will not lie against [GEICO General] unless the policy terms have been complied with" while omitting "and until 30 days after proof of loss is filed and the amount of loss is determined." (*Compare* DE 42 at 19 *with* DE 21-5 at 18 *and* DE 42-1 at 20.)

As such, the undersigned respectfully recommends that Defendants' motion to compel the appraisal of Plaintiffs' loss vehicles be denied.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendants' motion to dismiss, motion to strike, and motion for summary judgment on the appraisal issue be denied.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:  Central Islip, New York
        March 22, 2022

                                            /s/ *James M. Wicks*
                                            JAMES M. WICKS
                                        United States Magistrate Judge